**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )

GREATER YELLOWSTONE COALITION )
13 South Willson Avenue, Suite 2 )
Bozeman, MT  59715; )
 )
THE WILDERNESS SOCIETY )
1615 M Street NW )
Washington, DC 20036; )
 )
NATURAL RESOURCES DEFENSE COUNCIL )
40 West 20th Street )
New York, NY 10011; )        Case No. _____
 )
WINTER WILDLANDS ALLIANCE )
910 Main Street, Suite 235 )
Boise, ID 83702; )
 )
SIERRA CLUB )
85 Second Street, 2nd Floor )
San Francisco, CA  94105; )
 )
     Plaintiffs, )
 )
   vs. )
 )
DIRK KEMPTHORNE, in his official capacity as )
Secretary of the Interior; LYLE LAVERTY, in his official )
capacity as Assistant Secretary of the Interior for Fish and )
Wildlife and Parks; and MARY BOMAR, in her official )
capacity as Director of the National Park Service, )
 )
    Defendants. )
_____ )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.     In this case, plaintiffs Greater Yellowstone Coalition, et al., challenge the present

administration's last effort to perpetuate recreational snowmobile use in Yellowstone National

Park, Grand Teton National Park, and the John D. Rockefeller, Jr. Memorial Parkway

(collectively, "Yellowstone" or "the Parks"), in violation of National Park Service mandates, an order of this Court, and the recommendation of the agency's own biologists.  On September 15, 2008, this Court rejected the administration's 2007 decision to allow 540 snowmobiles within Yellowstone each winter day, concluding that "the Plan clearly elevate[d] use over conservation of park resources and values and fail[ed] to articulate why the Plan's 'major adverse impacts' [we]re 'necessary and appropriate to fulfill the purposes of the park.'"  Greater Yellowstone Coalition v. Kempthorne, 577 F. Supp. 2d 183, 210 (D.D.C. 2008).  On December 9, 2008, the administration responded with a regulation authorizing 720 snowmobiles within the Park—180 more than the rule held arbitrary and unlawful by this Court only three months before.  The administration's new winter use plan—one premised upon a District of Wyoming order that left the Park Service with discretion to promulgate a lawful rule genuinely protective of park resources—only exacerbates the deficiencies of its predecessor, allowing even greater harm to Yellowstone's air, natural quiet, and wildlife.  Like its predecessor, therefore, the administration's new winter use plan should be set aside in order to secure Yellowstone and the "national park idea" it embodies.

## PARTIES

2.      Plaintiff Greater Yellowstone Coalition ("GYC") is a conservation organization dedicated to protecting and restoring the Greater Yellowstone Ecosystem and the unique quality of life it sustains.  Central to GYC's mission is maintaining the integrity of the national parks that are the core of the larger ecosystem.  Formed in 1983, GYC is a non-profit corporation and has approximately 9,000 members, many of whom regularly use and enjoy Yellowstone and Grand Teton national parks.

3.      Plaintiff The Wilderness Society ("TWS") is a non-profit organization dedicated to protecting a national network of wild lands and fostering an American land ethic.  TWS works to ensure wise management and protection of America's public lands, including Yellowstone. Founded in 1935, TWS has approximately 200,000 members, many of whom regularly use and enjoy Yellowstone and Grand Teton national parks.

4.      Plaintiff Natural Resources Defense Council ("NRDC") is a non-profit organization that uses law, science, and the support of more than 1.2 million members and online activists to protect the planet's wildlife and wild places, and to ensure a safe and healthy environment.  NRDC and its members have a longstanding interest in preserving Yellowstone's unique natural resources, including the integrity of visitor experience.

5.      Plaintiff Winter Wildlands Alliance is a non-profit organization that advocates nationally for non-motorized backcountry winter recreation.  Representing more than 1,100 individual members and 28 grassroots groups to promote human-powered snowsports activities, Winter Wildlands Alliance works with federal, regional, and local land managers to resolve user conflicts on public lands and to promote a quality backcountry winter recreation experience on those lands.

6.      Plaintiff Sierra Club is a national conservation organization with more than 700,000 members.  Founded in 1892, its mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity to protect and to restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

7.      Members of each of the plaintiff organizations visit the Parks in winter to observe wildlife, ski and snowshoe, and to enjoy the Parks' spectacular scenery and natural quiet.  Even

from afar, members of each of the plaintiff groups take an active interest in maintaining the integrity of the National Park System.  The Park Service's authorization of snowmobile use and its inadequate environmental analysis cause direct, irreparable injury to the aesthetic, recreational, informational, and conservation interests of members of the plaintiff organizations. These injuries are fairly traceable to the challenged regulation and are redressable through this action to invalidate the rule.  Plaintiffs have no adequate remedy at law.

8.       Defendant Dirk Kempthorne is the Secretary of the U.S. Department of the Interior and, in that capacity, has oversight authority over all actions of the National Park Service.  Mr. Kempthorne is sued in his official capacity.

9.       Defendant Lyle Laverty is the Assistant Secretary of the U.S. Department of the Interior for Fish and Wildlife and Parks, and, in that capacity, signed the regulation challenged in this case.  Mr. Laverty is sued in his official capacity.

10.      Defendant Mary Bomar is the Director of the National Park Service and, in that capacity, has management responsibility for all actions of the National Park Service.  Ms. Bomar is sued in her official capacity.

**JURISDICTION AND VENUE**

11.      This action arises under the National Park Service Organic Act, 16 U.S.C. §§ 1, et seq.; Yellowstone's enabling legislation, 16 U.S.C. §§ 21, et seq.; the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq. ("NEPA"); and the Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. ("APA"), which waives defendants' sovereign immunity.

12.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

13.     Venue lies in the District of the District of Columbia pursuant to 28 U.S.C. §

1391(e) because defendants Kempthorne, Laverty, and Bomar, and plaintiff The Wilderness

Society reside in this District, and because a substantial part of the events and omissions giving

rise to plaintiffs' legal claims transpired in this District.

## BACKGROUND

14.     Yellowstone National Park is the embodiment of a transformative American idea.

On March 1, 1872, spurred by "the beautiful and astonishing features of a region unlike any

other in the world[,]" The Yellowstone Park Bill, N.Y. Times, Feb. 29, 1872, Congress

established Yellowstone as the world's first National Park.  See 16 U.S.C. § 21.  The notion was

simple.  As steward of Yellowstone's land and wildlife, the Secretary of the Interior would be

required to "provid[e] for the preservation, from injury or spoliation, of all … natural curiosities,

or wonders, within the park, and their retention in their natural condition."  Id. § 22.  With this

mandate, Congress secured Yellowstone as a sanctuary for plants, wildlife, and humans alike.

15.     It is of little surprise that Yellowstone's landscape inspired Congress to ensure its

preservation.  Within the Park's more than two-million acres lie half of the world's geothermal

features—a diverse and surreal population of geysers, steam vents, mudpots, and hotsprings.

Together, these structures punctuate Yellowstone's winter quiet—a quiet built from some of the

lowest natural sound levels ever documented—with the "intermittent gurgling, hissing, rushing,

and eruptive sounds" of geothermal activity.  National Park Service, Winter Use Plans, Final

Environmental Impact Statement (Sep. 2007) ("2007 FEIS"), at 138.  Warmed by this activity,

the Firehole, Gibbon, and Madison Rivers flow throughout Yellowstone's deep winters,

nourishing plants and wildlife within the Park.  Today, the wildlife that gather during

Yellowstone's winter months include critical populations of wolves, wolverines, lynx, bald

eagles, trumpeter swans, and the largest remaining genetically pure bison herd in the nation.  As

the result of an unprecedented notion more than a century ago, Yellowstone anchors one of the

best-preserved ecosystems in the world.

16.     Yellowstone's significance extends well beyond the Park's physical boundaries.

In the decades following the establishment of Yellowstone National Park, Congress set aside

additional lands to be "preserved and managed for the benefit and inspiration of all the people of

the United States"—the rugged expanses of Grand Teton National Park and the John D.

Rockefeller, Jr. Memorial Parkway among them.  In 1916, Yellowstone's enabling legislation in

hand, Congress enacted the National Park Service Organic Act, with it creating an agency wholly

dedicated to "conserv[ing] the scenery and the natural and historic objects and the wild life

[within the National Parks] and to provid[ing] for the enjoyment of the same in such manner and

by such means as will leave them unimpaired for the enjoyment of future generations."  16

U.S.C. § 1.  Congress "reaffirm[ed]" this mandate with the Redwoods Act in 1978, "declar[ing]

… and direct[ing] that the promotion and regulation of the various areas of the National Park

System … shall be consistent with and founded in the purpose established by [the Organic Act],

to the common benefit of all the people of the United States."  Id. § 1a-1.  Under the terms of the

Act, the Park Service's "authorization of activities shall be construed and the protection,

management, and administration of [the National Park System's lands] shall be conducted in

light of the high public value and integrity of the National Park System and shall not be

exercised in derogation of the values and purposes for which these various areas have been

established[.]"  Id.

17.     As stated in the Park Service's Management Policies, "[t]he fundamental purpose of

the national park system" accordingly "begins with a mandate to conserve park resources and

values"—the Park Service "must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values."  NPS Management Policies ("NPS Policies") § 1.4.3.  Specifically, the Park Service must "minimize[e] human impacts on native plants, animals, populations, communities, and ecosystems," id. § 4.4.1, "seek to perpetuate the best possible air quality in parks[,]" id. § 4.7.1, "take action to prevent or minimize all noise that through frequency, magnitude, or duration adversely affects the natural soundscape or other park resources or values," id. § 4.9, and, where the use of motorized vehicles "is necessary and appropriate," use "the least impacting equipment … [and] vehicles, … consistent with public and employee safety[,]" id. § 8.2.3.

18.     All told, in the words of the National Park Service,

> [t]he years have shown that the legacy of those who worked to establish Yellowstone National Park in 1872 was far greater than simply preserving a unique landscape. This one act has led to a lasting concept—the national park idea. This idea conceived wilderness to be the inheritance of all people, who gain more from an experience in nature than from private exploitation of the land. Scores of nations have preserved areas of natural beauty and historical worth so that all people will have the opportunity to reflect on their natural and cultural heritage and to return to nature and be spiritually reborn. Of all the benefits resulting from the establishment of Yellowstone National Park, this may be the greatest.

Yellowstone: A Brief History of the Park, available at http://www.nps.gov/yell/planyourvisit/ upload/Yell257.pdf.

19.     The present administration's persistent efforts to perpetuate recreational snowmobiling within Yellowstone National Park at the expense of the Park's air, wildlife, and natural quiet cannot be reconciled with this "national park idea"—an idea contained in the mandates by which the National Park Service is bound.

## The History of Snowmobile Use in Yellowstone

20.     In 1971, eight years after snowmobiles were first allowed in the Park, the

National Park Service began grooming Yellowstone's snow-covered roads for use by

snowmobiles and other oversnow vehicles.  Snowmobile usage increased dramatically through

the 1970s and 1980s, and concerns regarding the effects of the machines on park resources

mounted.  In response to the impacts of snowmobiling and other off-road vehicle use on public

lands, Presidents Nixon and Carter issued executive orders mandating that the Park Service allow

such machines in the national parks only when their operation would "not adversely affect [the

lands'] natural, aesthetic, or scenic values."  Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (Feb. 8,

1972), as amended by Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 24, 1977).

Recreational snowmobiling within Yellowstone increased nonetheless.  By the early 1990s,

snowmobile numbers were exceeding all agency projections, and the Park Service recognized

that development of a new policy was necessary to address the adverse impacts caused by

increasing snowmobile traffic within the Park.

## The National Park Service's 2001 Snowcoach Rule

21.     In 1997, in settling a lawsuit brought in this Court by The Fund for Animals and

others, the Park Service agreed to prepare an environmental impact statement ("EIS")

"addressing a full range of all alternatives for all types of visitor winter use, including

snowmobiling and trail grooming ... and considering the effects of those alternatives on the …

environments" of Yellowstone National Park, Grand Teton National Park, and the John D.

Rockefeller, Jr. Memorial Parkway.  See Fund for Animals, 294 F. Supp. 2d 92, 99 (D.D.C

2003) (internal quotations omitted).  After three years of study, the Park Service confirmed what

had long been obvious to the Parks' visitors and personnel:  recreational snowmobiling at

existing levels "harm[ed] the integrity of the resources and values of the[] three parks, and so constitute[d] an impairment of [park] resources and values, which is not permissible under the NPS Organic Act."  Record of Decision, Winter Use Plans for the Yellowstone and Grand Teton National Parks and John D. Rockefeller, Jr. Memorial Parkway ("2000 ROD"), 65 Fed. Reg. 80,908, 80,916 (Dec. 22, 2000).  In Yellowstone, this impairment was widespread, affecting the Park's "air quality, wildlife, the natural soundscape, and opportunities for enjoyment of the park by visitors."  Id.  The experience of those "who … visit the … parks once or twice in a lifetime, and who seek the resources and values for which the parks were created," the Service observed, could be "adversely and irretrievably affected" by the adverse impacts of snowmobile use within the Parks.  Id. at 80,915.

22.      In its 2000 EIS, the Park Service considered various means of avoiding unlawful impairment of park resources and values while allowing continued access to the Parks by increasing numbers of winter visitors.  All but one of the EIS's alternatives provided for continued recreational snowmobile use.  Five alternatives provided for strict standards governing snowmobile noise and emissions, a substantial reduction in the area open to recreational snowmobiling, a so-called "adaptive planning approach," or some combination of such measures.  See id. at 80,922.  Nonetheless, the Park Service concluded that continued recreational snowmobiling within the Parks—even under significant technological and use restrictions—would "adversely impact[] and impair[] park resources and values."  Id. at 80,917. As the Park Service explained,

> Clean, quiet and odorless snowmobiles are not available at present. Even with technical advances in snowmobiles, the impacts of snowmobile use on wildlife, especially ungulates [such as bison and elk] using groomed routes, constitutes disturbance and harassment at a time when individual animals are particularly challenged for survival.  The continued use of snowmobiles as

> provided in the alternatives studied … is found to be inconsistent
> with the health and integrity of resources existing in the three park
> units.   Continued use hinders the enjoyment of resources and
> values for which the parks were created, most notably natural
> soundscapes, clean and clear air, and undisturbed wildlife in a
> natural setting.

Id. at 80,916-17.  Accordingly, the Park Service concluded that such snowmobile use "must be

discontinued in order to meet [the agency's] primary mandates, regulations and policies[.]"  Id.

at 80,917.

23.     In reaching this conclusion, the Park Service was fully aware of the potential

"social and economic impacts" of the determination.  See 65 Fed. Reg. at 80,917.  The Service

determined that these impacts would be mitigated, however, under the last and environmentally

preferred of the alternatives—one providing for unlimited access to Yellowstone by snowcoach.

24.     The disparity between snowmobile and snowcoach access was striking, there

being "a clear magnitude of difference between the impacts of snowmobiles and the impacts of

snowcoaches on natural resource values and the opportunities to enjoy them."  Id.  With the

snowcoach alternative came "greatly decreased volumes of traffic and consequent decreases in

odor, noise, and pollutants."  Id.  Moreover, "[t]he area within the three park units that would be

available for use without audible motorized sound [was] maximized using snowcoach access."

Id.  "Additionally, because operators of snowcoaches [would] be familiar with park roadways

and trained in appropriate techniques for mitigating the effects of vehicle-wildlife encounters the

potential for wildlife harassment [would] be minimized."  Id.  Safety was also found to be

improved to the "highest degree" under the snowcoach alternative, as the alternative imposed

"greater controls over speed, time of operation, driver training and experience, and the volume of

traffic" than any snowmobile alternative.  Id.  All told, snowcoaches "offer[ed] access to the

public that [was] equivalent in numbers to current use" and additionally made the Park

"accessible to a larger population of young, elderly, and disabled visitors." Id.  With a

November 22, 2000 Record of Decision, the Park Service announced that an unimpaired

Yellowstone would be accessible by snowcoach.  Id. at 80,909.

25.     Two months later, the Park Service promulgated a regulation providing for the

elimination of recreational snowmobiling from Yellowstone in order "to come into compliance

with the legal requirements that apply to snowmobile use in national parks."  Special

Regulations, Areas of the National Park System, 66 Fed. Reg. 7,260 (Jan. 22, 2001).  In

responding to public comments regarding the regulation, the Service rejected the suggestion that

snowmobiles be allowed in limited numbers or guided groups.  As the agency explained,

"[a]chieving compliance with the applicable legal requirements while still allowing snowmobile

use would require very strict limits on the numbers of both snowmobiles and snowcoaches"—

restrictions that would "sharply limit overall winter use of the parks, reducing the opportunities

for public enjoyment of the parks and causing even greater adverse impacts on affected gateway

communities and businesses."  Id. at 7,262.  As snowcoaches had "far fewer and less extensive

adverse impacts than snowmobiles," they could "be … accommodated … without numerical

limits[.]"  Id.  The Service's regulation accordingly required significant reductions in

snowmobile numbers during the 2002-2003 winter season, followed by a complete transition to

snowcoaches in Yellowstone by the 2003-2004 winter season.

**The Political Reversal of the Snowcoach Rule**

26.     The National Park Service's 2001 snowcoach rule, promulgated by the Clinton

administration after three years of study and extensive public comment, was "immediately

stayed" by the incoming administration of President George W. Bush.  Fund for Animals, 294 F.

Supp. 2d at 100.  Six months later, the new administration agreed to prepare a supplemental

environmental impact statement ("SEIS") as part of the settlement of a Wyoming lawsuit filed by

the International Snowmobile Manufacturers Association and others to challenge the 2001 rule.

The stated purpose of the SEIS was two-fold:  to address additional manufacturer information

regarding snowmobile technology and to consider public comment beyond the "more than

59,000 comments" that had been received during the prior environmental analysis and

rulemaking process.  See id.  By many accounts, however, the underlying objective of the action

was the development of a rule perpetuating recreational snowmobiling within the Parks—

whatever the requirements of the Organic Act.

27.    In conducting its supplemental analysis, the administration made little effort to

disguise the fate of the Park Service's phase-out rule.  On November 8, 2002, then–Deputy

Secretary of the Interior J. Steven Griles signed a regulation "postponing" implementation of the

snowmobile phase-out—an action that "enable[d]" the agency "to complete the [SEIS] process

without implementing the 50% reduction that [wa]s due to go into effect during the winter use

season 2002-2003 under the current regulations."  See Special Regulations, Areas of the National

Park System, 67 Fed. Reg. 69,473-75, 69,478 (Nov. 18, 2002).  While most of those commenting

on the postponement opposed the idea, the Department concluded that "implementing the 50%

reduction in the winter of 2002–2003, as originally scheduled," would be "undesirable."  Id.

"[U]nder the ongoing SEIS process," the Department explained, "the NPS [was] considering

whether new snowmobile technology and some travel restrictions (such as guided trips and

operator training) would allow recreational snowmobile use to continue in the park units."  Id.

The Department dismissed comments suggesting that the Park Service could authorize continued

recreational snowmobiling only by disregarding the purposes for which Yellowstone had been

set aside.  According to the Department:

> Within the final SEIS, the NPS [was] considering how to provide various use areas throughout the parks in order to allow for motorized and nonmotorized activities. Each person characterizes his or her "refuge" and expectations of the ideal park visit in a different way. What one person values in the park experience may be contrary to another's. The NPS hopes to provide a wide spectrum of experiences to visitors from around the country and around the world.

Id. at 69,476.

28.     The administration published a new regulation authorizing expanded recreational snowmobiling within Yellowstone National Park on December 11, 2003—nearly ten months after publishing a final SEIS that presented "analysis and … alternatives … not vastly different than those in the [2000] Final EIS[,]" and that selected as "environmentally preferred" the alternative providing for snowcoach access to the Park. See Special Regulations, Areas of the National Park System, 68 Fed. Reg. 69,268, 69,274 (Dec. 11, 2003); National Park Service, Winter Use Plans Record of Decision (Mar. 25, 2003) ("2003 ROD") at 6-7. Under the rule, 950 snowmobiles were to be allowed within Yellowstone each day—subject to technology limitations, a guided group requirement, and the possibility of adaptive management measures should "desired resource conditions" not be met. 68 Fed. Reg. at 69,277, 69,282-85. These restrictions, the administration declared, would "substantially improve air quality conditions relative to the current situation of unregulated snowmobile use." Id. at 69,276.

### The Invalidation of the 2003 Rule

29.     The Greater Yellowstone Coalition plaintiffs challenged the administration's 2003 winter use plan as an arbitrary and capricious departure from the Park Service's prior determination that recreational snowmobiling was incompatible with the mandates governing Yellowstone. In a December 16, 2003 opinion, this Court vacated the regulation, concluding that the administration's decision—a "dramatic change in course, in a relatively short period of time

and conspicuously timed with the change in administrations"—"represent[ed] precisely the

'reversal of the agency's views' that triggers an agency's responsibility to supply a reasoned

explanation for the change." Fund for Animals, 294 F. Supp. 2d at 105.  Having failed to explain

its reversal of the Park Service's prior determination, the Court concluded, the administration's

decision was of the "quintessentially arbitrary and capricious" sort that could not be allowed to

stand. Id. at 108 (internal quotations omitted).

30.     The administration had argued otherwise, contending that its reversal of the

phase-out rule was well explained by the technology and guiding requirements included within

the new regulation.  The Court was not persuaded.  "The possibility of improved technology was

explicitly considered in the 2000 ROD," the Court noted, "and just as explicitly rejected as an

inadequate solution for reducing the negative impacts of snowmobiling." Id. at 106.  Moreover,

the administration had not abandoned the Park Service's prior determination that "'[c]leaner,

quieter snowmobiles would do little, if anything, to reduce the most serious impacts on

wildlife[,]'" further undermining its contention that technology justified the 2003 rule. Id. at

106-07 (emphasis in original).  Finally, the Court noted that the administration's reliance on the

promise of continued technological improvements within the snowmobile industry appeared

misplaced, as the 2003 rule itself admitted that some of 2004's snowmobiles were emitting more

pollutants than their 2002 counterparts.

31.     With respect to the rule's entry restrictions and guided group requirements, the

Court concluded that such measures were "significantly flawed[.]" Fund for Animals, 294 F.

Supp. 2d at 107.  The entry limits, for one, did "not actually appear to reduce snowmobile use[.]"

Id.  The requirement of group travel was deemed little more effective, as the administration's

rule defined a group as "'1-11 snowmobiles'" and thereby "eliminat[ed]" the benefits of group

travel to wildlife.  Id.  With respect to guides, the Court noted the documented difficulties in

communication between persons riding on the same snowmobile—difficulties that would be

even more pronounced among a group of riders spread up to one-third of a mile apart.

32.     The disparity between the 2001 and 2003 decisions, the Court concluded, was

"stark."  Fund for Animals, 294 F. Supp. 2d at 107.

> In 2001, the rulemaking process culminated in a finding that
> snowmobiling so adversely impacted the wildlife and resources of
> the Parks that all snowmobile use must be halted.  A scant three
> years later, the rulemaking process culminated in the conclusion
> that nearly one thousand snowmobiles w[ould] be allowed to enter
> the park each day.  In 2001, the NPS selected the 'environmentally
> preferred alternative.'   In 2003, the NPS rejected the
> environmentally preferred alternative, and instead chose an
> alternative whose 'primary beneficiaries' are the 'park visitors who
> ride snowmobiles in the parks and the businesses that serve them.'

Id. at 107-08 (quoting the 2003 final rule).  Despite the "clear conservation mandate" governing

the Parks, the Court concluded, the administration had failed to explain this reversal.  Id. at 108.

Indeed, evidence in the record suggested that there was no explanation, the administration's

supplemental analysis having been "completely politically driven and result oriented."  Id. at 108

n.11.  Accordingly, the Court vacated the 2003 rule and remanded it to the Park Service for

reconsideration in light of the Court's opinion.  Id.  Consistent with the language of the

administration's 2003 rule, the Court ordered that the 2001 snowcoach regulation be

implemented by the National Park Service.  Id. at 115.

### Winter Use under the 2004 "Temporary Plan"

33.     In the wake of this Court's ruling, the State of Wyoming reopened a prior

challenge to the 2001 rule in the District of Wyoming.  On February 10, 2004, the Wyoming

court entered a preliminary injunction prohibiting the Park Service from implementing the phase-

out rule and requiring the agency to "promulgate temporary rules for th[e] 2004 snowmobile

season that w[ould] be fair and equitable" to the various interests involved.  See Int'l

Snowmobile Mfrs. Ass'n v. Norton, 304 F. Supp. 2d 1278, 1294 (D. Wyo. 2004).  The Wyoming

court later made its injunction permanent.  Int'l Snowmobile Mfrs. Ass'n v. Norton, 340 F. Supp.

2d 1249 (D. Wyo. 2004).  Left without a regulation governing winter use in the Parks pending

the completion of a new environmental impact statement, decision, and long-term rule, the Park

Service developed a three-year "temporary plan" authorizing the recreational use of 720

snowmobiles in Yellowstone each day—subject to "best available technology" and commercial

guiding requirements.  See Special Regulations, Areas of the National Park System, 69 Fed. Reg.

65,348 (Nov. 10, 2004).  Sustained by a series of congressional appropriations riders, the

temporary plan remained in effect for three winter seasons.

34.     In each of Yellowstone's three winter seasons under the temporary plan,

recreational snowmobile use fell well short of authorized levels.  Between 2003 and 2007,

average snowmobile numbers ranged from 250 to 300 per day.  Even at these levels, however,

the adverse environmental impacts documented exceeded Park Service expectations and the

administration's own "adaptive management" thresholds.

35.     With respect to noise, oversnow vehicles were generally audible in the much-

visited Old Faithful and West Entrance travel corridor areas for more than half the day, often

exceeding the temporary plan's "50%" threshold by a significant margin.  The backcountry

soundscapes threshold was also exceeded on numerous occasions.

36.     With respect to air quality, the administration acknowledged "a potential problem

with benzene and formaldehyde exposure for employees."  National Park Service, Winter Use

Plans Record of Decision (Nov. 20, 2007) ("2007 ROD"), at 21.  In a series of studies between

2004 and 2006, benzene levels at Yellowstone's West Entrance were found to exceed the

Agency for Toxic Substances and Disease Registry's minimal risk levels—thresholds incorporated into the Park Service's own adaptive management program—on days when only 180 to 220 "best available technology" snowmobiles entered the Park through the West Entrance. Moreover, with an average of only 180 daily snowmobile entries, the National Institute for Occupational Safety and Health's recommended exposure limit for formaldehyde was itself approached. Four-stroke snowmobiles, the administration explained, "produce more benzene (and some other hazardous air pollutants) than the two-stroke engines used historically[.]" 2007 FEIS at 99. "Clearly," the administration admitted, "reducing the daily snowmobile numbers [would] better protect park air quality." 2007 ROD at 21.

37. Finally, with respect to wildlife, the Park Service's own biologists recommended that oversnow vehicle numbers be maintained "at or below" the reduced levels of recent seasons in order to minimize animal disturbance and thereby avoid adverse fitness effects during Yellowstone's harsh winter months.

## The Administration's 2007 Rule

38. The administration was unmoved by the harms documented during Yellowstone's years under the temporary plan. In late 2007, ignoring the evidence of existing, unallowable impacts to park resources and values, the recommendation of Park Service biologists, and a letter from seven former directors of the National Park Service noting the incompatibility of snowmobiling with Park Service mandates, the administration adopted a new snowmobile plan providing for the recreational use of 540 snowmobiles each day within the Park—twice the average of recent seasons. By the administration's own calculations, the level of use authorized under the new regulation would have tripled the area in which oversnow vehicles were audible during half or more of the day while, at a minimum, increasing carbon monoxide emissions by

18 percent, benzene emissions by 33 percent, hydrocarbon emissions by 50 percent,

formaldehyde emissions by 60 percent, and particulate matter emissions by 100 percent over

recent winter levels.

39.     Rather than dwelling on these figures, the administration declared that its new

snowmobile plan would place "strict limits on the number of snowmobiles allowed to enter the

Park[] each day" and thereby avoid "unacceptable impacts" on park resources and values.  See

Special Regulations, Areas of the National Park System, 72 Fed. Reg. 70,781, 70,783 (Dec. 13,

2007).  Despite the fact that its new regulation authorized a doubling of recent snowmobile

numbers within Yellowstone—numbers that have resulted in violations of multiple resource

thresholds—the administration attempted to characterize the plan's 540-snowmobile cap as "a

reduction[,]" noting that 720 snowmobiles could have entered the Park each day under the

provisions of the temporary plan.  Id. (emphasis added).  This "reduction," the administration

contended, would somehow improve conditions within Yellowstone, as the "lower number of

snowmobiles" allowed under the new plan would "reduce the impacts on the natural soundscapes

of the park, which the NPS found to be somewhat greater than expected even with the reduced

number of snowmobiles that used the park over the last several winters."  Id.  Moreover, the

administration argued, again, that the adverse impacts of recreational snowmobile use would be

mitigated by "best available technology" standards, a requirement that snowmobiles travel in

commercially guided groups of one to eleven, and possible "adaptive management" actions that

might address future impacts to park resources.

40.     In explaining its decision to allow an expansion of recreational snowmobile use

within Yellowstone National Park, the administration was again dismissive of the snowcoach

alternative previously adopted by the Park Service.  While acknowledging that new snowcoaches

could be "substantially cleaner" than "four-stroke snowmobiles … , especially given that

snowcoaches currently carry an average of 7 times more passengers than snowmobiles[,]" the

administration declared that "[s]nowcoaches and snowmobiles provide two very different types

of experiences for park visitors seeking to enjoy Yellowstone during the winter."  72 Fed. Reg. at

70,785, 70,787.  Moreover, the administration noted, "[t]he use of both [snowmobiles and

snowcoaches] is well-established in the Parks, extending back more than 4 decades."  Id. at

70,787.

      41.     With this statement, the administration ignored the better part of Yellowstone's

history—that which had secured the Park for this and later generations.  The Greater

Yellowstone Coalition plaintiffs accordingly filed a challenge to the 2007 plan, contending that

the administration had again disregarded law and science in its continued effort to perpetuate

recreational snowmobiling within Yellowstone National Park.

<b>The Invalidation of the 2007 Rule</b>

      42.     In an exhaustive September 15, 2008 opinion, this Court rejected the

administration's 540-snowmobile rule as arbitrary, capricious, and unlawful.  In light of the

significant environmental harms that had been documented as a result of snowmobile use in

recent winter seasons, the Court concluded that the administration's decision to allow a doubling

of those harms was at odds with the requirements of the Park Service's Organic Act.  In the

words of the Court, "[t]he Organic Act clearly states … that the fundamental purpose of the

national park system is to conserve park resources and values"—a purpose that requires the Park

Service, "at the very least, … to exercise its discretion in a manner that is 'calculated to protect

park resources' and genuinely seeks to minimize adverse impacts on park resources and values."

Greater Yellowstone Coalition, 577 F. Supp. 2d at 192-93.  The Park Service, the Court

emphasized, "cannot circumvent this limitation through conclusory declarations that certain

adverse impacts are acceptable[.]"  Id. at 193.  Because the administration had "clearly elevate[d]

use over conservation of park resources and values and fail[ed] to articulate why the Plan's

'major adverse impacts' [we]re 'necessary and appropriate to fulfill the purposes of the park[,]'"

the administration's 540-snowmobile rule could not be sustained.  Id. at 210.  Moreover, because

the administration's FEIS had, among other things, "relie[d] on admittedly inaccurate sound

modeling data, employ[ed] a park-wide metric that dilute[d] the Plan's impacts on soundscapes

and air quality, and utterly fail[ed] to explain why none of the seven [considered] alternatives

would [have] constitute[d] 'impairment' or unacceptable impacts[,]" the Court held that it "d[id]

not provide the decisionmaker with a clear analysis of the alternatives that NEPA requires."  Id.

Accordingly, the Court vacated and remanded the administration's FEIS, decision, and

regulation "for proceedings consistent with [its] opinion."  Id.

### The Administration's 2008 Rule

43.    This Court's invalidation of Yellowstone's 2007 winter use plan marked the

demise of the present administration's eight-year effort to conserve recreational snowmobiling,

unimpaired, within the nation's first national park.  It also afforded the outgoing administration a

final opportunity to secure Yellowstone's air, quiet, and wildlife for this and later generations, as

required by Park Service mandates.  In a final display of caprice, however, the administration has

squandered this opportunity, offering the American public an incoherent rewrite of the Park

Service's own science and a regulation authorizing snowmobile use at a level approaching

historic averages.

44.    On November 5, 2008, the administration published a proposed "Interim Winter

Use Plan" intended to govern winter access to Yellowstone for three winter seasons.  See Special

Regulations, Areas of the National Park System, 73 Fed. Reg. 65,784 (Nov. 5, 2008).  Under the

plan, 318 snowmobiles were to be authorized within Yellowstone each winter day—an increase,

again, over the already harmful numbers seen in recent winter seasons.  In addition to

disregarding the Park Service's own noise and air quality thresholds, this increase contradicted

the work of the Park Service's own biologists, who had previously recommended that fewer

oversnow vehicles be permitted in Yellowstone in order to protect the Park's wildlife.  Disliking

the agency's science, the administration simply rewrote it, declaring that the Park Service's

biologists had intended, in fact, to endorse a substantial increase in the number of oversnow

vehicles used within Yellowstone National Park.  National Park Service, Winter Use Plans

Environmental Assessment (Nov. 2008), at 4-9–4-10.

45.     The administration's proposed interim plan was short-lived.  On November 7,

2008, the District of Wyoming issued an "order implementing temporary remedy" in State of

Wyoming v. U.S. Department of the Interior, a case challenging the limitations imposed upon

recreational snowmobiling by the invalidated 2007 winter use plan.  See Order Implementing

Temporary Remedy and Granting Motion to Intervene, State of Wyoming v. U.S. Department of

the Interior, No. 07-cv-319-B (Nov. 7, 2008) ("Wyo. Order").  While emphasizing that it would

have upheld the administration's 540-snowmobile regulation, the Wyoming court acknowledged

that "the D.C. District Court's invalidation of the … rule" would "remain undisturbed[.]"  Id. at

21.  Nonetheless, citing a "disordered and confusing state of affairs[,]" the Wyoming court

ordered the Park Service to "reinstate the 2004 temporary rule" allowing 720 daily snowmobile

entries into Yellowstone "until such time as it c[ould] promulgate an acceptable rule to take its

place."  Id. at 15, 21.

46.     By its own terms, the Wyoming court's "temporary remedy" in no way precluded

the Park Service from implementing an alternate winter use plan consistent with Park Service

mandates and the September 15, 2008 decision of this Court.  This the administration ignored.

On December 9, 2008, the administration promulgated a regulation allowing 720 snowmobiles

into Yellowstone each winter day—a level of recreational snowmobile use it had rejected during

its 2007 planning process.  Because the administration's new regulation authorizes even greater

harm to Yellowstone's air, quiet, and wildlife than the 540-snowmobile rule rejected only three

months ago by this Court, it, too, must be invalidated.

## FIRST CAUSE OF ACTION
### Violation of the Organic Act and Yellowstone's Enabling Legislation

47.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

48.     Yellowstone National Park was set aside to "provid[e] for the preservation, from

injury or spoliation, of all … natural curiosities, or wonders, within the park, and their retention

in their natural condition."  16 U.S.C. § 22.  Consistent with this purpose, the National Park

Service is required, first, "to conserve the scenery and the natural and historic objects and the

wild life" within Yellowstone and the nation's other national parks, and, second, "to provide for

the enjoyment of the same in such manner and by such means as will leave them unimpaired for

the enjoyment of future generations."  Id. § 1.  The Park Service's Management Policies

accordingly require that the agency "seek ways to avoid, or to minimize to the greatest extent

practicable, adverse impacts on park resources and values[,]" NPS Policies § 1.4.3, managing our

national parks in a manner that, among other things, "minimize[s] human impacts on native

plants, animals, populations, communities, and ecosystems," id. § 4.4.1, "perpetuate[s] the best

possible air quality in parks[,]" id. § 4.7.1, and "prevent[s] or minimize[s] all noise that through

frequency, magnitude, or duration adversely affects the natural soundscape or other park

resources or values," id. § 4.9.

49.     The administration's eleventh-hour authorization of significantly expanded snowmobile use within Yellowstone—an unexplained departure from the Park Service's 2001 snowcoach rule and the administration's 2007 rejection of a 720-snowmobile plan—cannot be reconciled with these provisions.  Eight years ago, the Park Service acknowledged that substantial numbers of snowmobiles could not be permitted within the Parks without impairing park resources and values—even with "best available technology" and guided group requirements.  Subsequent studies confirmed this conclusion, demonstrating that even limited snowmobile use could not be allowed within Yellowstone without breaching the Park Service's own noise and air quality thresholds, and prompting agency biologists to recommend that oversnow vehicle numbers be maintained, if not reduced, to protect Yellowstone's winter-stressed wildlife.  At the same time, the Park Service repeatedly affirmed that the adverse impacts of snowmobile use within Yellowstone would largely be avoided by a full transition to snowcoach access.

50.     In light of these studies, this Court rejected—only three months ago—the administration's 2007 decision to authorize 540 snowmobiles within Yellowstone each winter day, concluding that the administration had "clearly elevate[d] use over conservation of park resources and values and fail[ed] to articulate why the Plan's 'major adverse impacts' [we]re 'necessary and appropriate to fulfill the purposes of the park.'"  Greater Yellowstone Coalition, 577 F. Supp. 2d at 210.  The administration's new decision to allow 720 daily snowmobile entries into Yellowstone only exacerbates the deficiencies of its prior, invalidated plan.  Under the challenged regulation, Yellowstone's resources and values will be further impaired in order to allow snowmobile use at levels approaching historic averages.

51.     In again authorizing continued and expanded snowmobile use within the Parks,

defendants have again flouted the Park Service's obligation to conserve park resources and leave them unimpaired, betraying a fundamental disregard for the mandates that have long secured our most cherished public lands.  The challenged regulation is accordingly arbitrary, capricious, an abuse of discretion, and contrary to law.  See 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION**
**Violation of Governing Executive Orders**

52.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

53.     Under Executive Orders 11,644 and 11,989, the Park Service may authorize snowmobiling in our national parks only when it "will not adversely affect their natural, aesthetic, or scenic values."  Exec. Order No. 11,644, 37 Fed. Reg. at 2,877.  Further, the Park Service must "immediately close" areas and trails to snowmobiling if use "will cause or is causing considerable adverse effects on … wildlife, wildlife habitat or cultural or historic resources[.]"  Exec. Order 11,989, 52 Fed. Reg. at 34,617.

54.     Continued and expanded recreational snowmobile use in the Parks pursuant to the challenged regulation will adversely affect wildlife, health, air quality, and natural quiet in the Parks.  Defendants' decision to again authorize snowmobile use in the face of these significant, adverse impacts to Yellowstone's natural, aesthetic, and scenic values violates the mandates set forth in Executive Orders 11,644 and 11,989.  The challenged regulation is accordingly arbitrary, capricious, an abuse of discretion, and contrary to law.  See 5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**
**Violation of National Park Service Regulations**

55.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

56.     In keeping with the relevant statutes and Executive Orders, Park Service regulations prohibit snowmobiling in our national parks except in designated areas where "their

use is consistent with the [parks'] natural, cultural, scenic and aesthetic values, safety

considerations, park management objectives, and will not disturb wildlife or damage park

resources."  36 C.F.R. § 2.18(c).

57.     In again authorizing recreational snowmobile use that will adversely affect

wildlife, health, air quality, and natural quiet in the Parks, defendants violated Section 2.18(c).

The challenged regulation is accordingly arbitrary, capricious, an abuse of discretion, and

contrary to law.  See 5 U.S.C. § 706(2)(A).

**FOURTH CAUSE OF ACTION**
**Violation of NEPA**

58.     All preceding paragraphs are incorporated as if fully set forth herein.

59.     Under NEPA, federal agencies must prepare an EIS for major actions that will

significantly affect the human environment.  42 U.S.C. § 4332(2)(C).  NEPA's implementing

regulations provide that an EIS must "state how alternatives considered in it and decisions based

on it will or will not achieve the requirements of … [NEPA] and other environmental laws and

policies[,]" 40 C.F.R. § 1502.2(d); see also id. 1502.16(c), and that federal agencies "shall

concentrate effort and attention on important issues," id. § 1502.15.  Ultimately, an EIS must

"[r]igorously explore and objectively evaluate all reasonable alternatives," thereby "sharply

defining the issues and providing a clear basis for choice among options by the decisionmaker

and the public."  Id. § 1502.14.

60.     As recently documented by this Court in Greater Yellowstone Coalition v.

Kempthorne, defendants' 2007 FEIS failed to provide the "clear analysis" required under NEPA,

having "relie[d] on admittedly inaccurate sound modeling data, employ[ed] a park-wide metric

that dilute[d] the [540-snowmobile] Plan's impacts on soundscapes and air quality, and utterly

fail[ed] to explain why none of the seven [considered] alternatives would [have] constitute[d]

'impairment' or unacceptable impacts[,]" among other things.  577 F. Supp. 2d at 210.  In

promulgating their new, 720-snowmobile regulation, defendants failed to address the numerous

deficiencies identified by this Court, electing instead to conduct no further environmental review

of their rule.

      61.     Because defendants failed to comply with NEPA in promulgating the challenged

regulation, the rule is arbitrary, capricious, an abuse of discretion, and contrary to law.  See 5

U.S.C. § 706(2)(A).

### REQUEST FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

      1)     Declare that the challenged regulation is arbitrary and unlawful, and set it aside;

      2)     Enjoin implementation of the challenged regulation following the 2008-2009

winter season, and order the National Park Service to prepare an interim winter use plan that

complies with this Court's prior orders while the agency prepares a final winter use plan

consistent with National Park Service mandates;

      3)     Remand the matter to the National Park Service;

      4)     Award plaintiffs their attorneys' fees and costs; and

      5)     Grant plaintiffs such other and further relief as the Court may deem proper.

Dated this ___ th day of December, 2008.

Respectfully submitted,

_____
Douglas L. Honnold (D.C. Bar # 468323)
dhonnold@earthjustice.org
Sean M. Helle (D.C. Bar # 490085)
shelle@earthjustice.org
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax